### HARRY KOBLITZ v. WESTERN RESERVE UNIVERSITY.

1. UNIVERSITY A PRIVATE CORPORATION.

A university of learning that has received its charter from the state and is exempt from paying taxes by legislation of the state, but has received no other benefit from the state, and has an endowment from private donors, and charges tuition fees to students, is a private corporation. The charity it administers may be public, but the corporation is private.

2. STATE WILL NOT EXERCISE VISITATORIAL POWER OR INTERFERE IN MANAGEMENT.

Where the corporation is private and is not administering funds contributed to its aid by the state, the state will not exercise visitatorial power over its domestic affairs, and will not interfere with its government unless there has been unjust, unfair and oppressive treatment of its students, nor will the state interfere with the management of the trust funds of the university unless there has been a breach of trust on the part of the officers of the university.

3. FAILURE OF STUDENT TO PERFORM OBLIGATIONS—DISMISSAL.

Whether the student, when he pays tuition for instruction in the university, thereby enters into a contract or obtains a mere license, is not material; in either case, there are numerous obligations which he agrees to perform and his failure to perform such obligations may be of such a nature that the university may be justified in dismissing him from the institution.

4. STUDENT DISCIPLINED NOT ENTITLED TO FORMAL TRIAL.

The student agrees to be disciplined by the faculty according to the custom of such institutions and, in administering such discipline, the authorities should afford him a fair opportunity of presenting evidence of his innocence, but are not under obligation to afford him all the formalities of a trial in a court of justice.

**5. Students Agree to Conform to and be Tried by Rules.**

The faculty of a university, under the custom of the land which has been uniform for so long a time that it has become law, are justified in disciplining students in the institution, and the student who enters such institution agrees to conform to that rule of law and to be tried for his demeanors by such rule.

**6. When Faculty May Remove Student.**

Where a student has been guilty of various breaches of duty, of such a nature. that it is injurious to the institution to allow him longer to remain as a student, and where opportunity has been afforded him to make full explanation before the faculty, and present evidence of his innocence, and where the faculty have made a careful examination of his conduct and have found his acts to be such that he is a very undesirable student and his presence is injurious to the benefits of the university, they are justified in removing him from the institution.

APPEAL.

*Ford, Quiber, Henry & McGraw* and *McKisson & Dawley*, for plaintiff.

*Williamson, Cushing & Clark*, for defendant.

CALDWELL, J.

The Western Reserve University, made one of the defendants in this case, is a corporation incorporated under the laws of the state of Ohio, and not for profit, and is for the purpose of imparting instruction. Its work is devided into several departments; one is the Franklin T. Backus Law School of The Western Reserve University in which instruction in the study and the practice of the law is imparted to those who enter as students. Charles Franklin Thwing is president of the university, and the defendant, Evan H. Hopkins, is dean of the law school. They are the executive officers in the management of that department.

The plaintiff is a resident of the city of Cleveland and in September, 1899, he was admitted as a student of the law school and was received by the university as such; he paid $100; that was the tuition for one year. He was admitted as a special student, and he attended the exercises and lectures in the school during the school year of 1899 and 1900, ending in June, 1900.

The university, by its catalogues and in other ways, represented to the public itself as ready and willing to impart instruction to all its students in good standing, and it conferred at the end of the law course, upon those having good character and having passed the examination satisfactory to the board of professors, the degree of LL. B. The advantage gained by the degree conferred upon students, is that of prestige in their profession and an aid in passing the examinations to the practice of law under the authority of the Supreme Court of the state of Ohio.

About March 15, 1900, the dean of the law school notified the plaintiff that his continuance as a student in the school was not desirable. Thereupon the plaintiff took counsel from an attorney as to his rights, and persisted in attending and did attend the exercises of the school up to the close of that year, June, 1900, and the defendant permitted him to attend the lectures up to that time, hoping that at the end of that school year he would withdraw from the school without any notoriety being given to the matter.

During the summer vacation he was several times told by the dean that he would not be allowed to return to the school in the fall; and

about September 10, 1900, he was notified by the university that he would not be allowed to return.

This action on the part of the law school and of the university was for two reasons: One, that the plaintiff's conduct had been such that it was detrimental to the best interests of the school and tended to beget insubordination on the part of the other students, and because he had not been successful in passing his examinations and keeping up his studies to the satisfaction of the teachers of the school.

After this action was commenced, he was, by stipulation between the parties, allowed to take and did take his examinations for studies that he had failed in, and such permission was given to him without prejudice to the rights and interests of either parties to this action.

After the action taken by the authorities of the school had been imparted to the plaintiff, he notified the authorities that he *would* attend the classes, regardless of the notices which had been given him to the effect that he would not be allowed to enter upon his second year in the college.

The plaintiff is about twenty-two years old. The school is a public institution. The building and equipment of the school have been furnished to the university by gift from private persons for the purpose of the school. No public funds have ever been received for the purpose of a law school or the university. The fees paid by students are applied to the payment of the running expenses of the school. The university makes no discriminations against any class or sect, but receives and retains any who fulfil the requirements in point of study and character.

The accusations against the plaintiff, so far as pertain to his character, were, that during the year he attended the school he was twice arrested on criminal charges; he was called before the faculty to explain his conduct, which led to his arrest, and his explanation was unsatisfactory. One of the charges grew out of a difficulty which he had with a fellow-student, and the evidence shows that it caused much annoyance to the faculty and authorities of the school. He indulged in threats and abusive language and disorderly conduct towards fellow-students in and out of the school building. The faculty found that he was untruthful, and that he was in general a disturbing and undesirable element in the school; and these were the accusations and findings that led up to his removal.

There is evidence offered in this court by the defendants, tending to prove all of the accusations above recited against the plaintiff. The plaintiff himself contradicts many of these witnesses.

There is evidence before the court showing conclusively that the state has never contributed anything to this institution, by way of funds or endowment of any kind, nor towards its property or the erection of its buildings. The evidence shows that the state bestowed upon the defendants its charter and has exempted it from taxation, and in no other way has the school ever been directly benefited by the state.

Much of the argument of the plaintiff's counsel in this case is built upon the superstructure and the single proposition that this university is a *public* corporation.

Incorporations in this state are divided into public and private. We see no advantage to be gained from going into a discussion of the distinctions between these two classes of corporations. Private corporations are sometimes divided into eleemosynary and lay or civil.

It is claimed that this corporation, while it may be classified as elee-mosynary, was created for a public purpose, the public being deeply interested in the education of its youth; and that the endowments given to the college were intended for all classes of youth, without any distinction whatever, providing their education and morals were such as could meet the conditions required by defendant.

The authorities all agree that while the charity may be public, the corporation is private. The charity distributed by hospitals or to the poor by trustees, or by way of schools, all have in them an element, so far as it pertains to charity, of *public* corporation, but at the same time the corporation itself is *private*.

The argument of counsel for plaintiff is, that the uses of this elee-mosynary corporation is in the distribution of a general charity, and that that charity is public and therefore the corporation that distributes the charity must be a public corporation.

But this is not the law as established by the authorities. Trustees of Dartmouth College v. Woodward, 17 U. S. (4 Wheat.), 518, 519; 1 Thomp. Com. on Corp., Sec. 26.

Angell & Ames on Corp., Sec. 34, says: " A college founded and endowed by private benefaction, though for the general promotion of learning, is a private corporation. A college merely because it receives a charter from the government, if founded by private benefactors, is not thereby constituted a public corporation controllable by the government."

The fact, then, that the charity is public, is no proof that the corporation also is public, and this being the foundation on which the counsel for plaintiff have built much of their argument, the foundation being removed and it being determined that the corporation is a private one, much of the argument becomes worthless to determine the questions in this case.

It becomes important to consider in this case, to what extent the state will interfere with the affairs of this university as a corporation.

It is contended that if it is a public corporation, the management and control of the college is entirely within the authority of the state. On the other hand, it is contended that inasmuch as the corporation is a private one, and the affairs of the corporation being committed to a board of trustees, the state will not interfere with the government and the internal affairs of the corporation, and that when the state sees to it that the purposes for which funds have been given to the university are being complied with, and that the trusts involved in the gift of such funds is being fully executed, according to the intention of the donors and the purposes of the organization, that there shall be no farther interference with the affairs of the corporation by the state.

In this regard corporations formed for the purpose of carrying out the purposes and objects of charitable gifts, and which corporations are known as eleemosynary corporations from the earliest history of such corporations, there has been no disposition on the part of the government creating them to interfere with their domestic concerns any farther than indicated in the rule above stated.

An eleemosynary corporation upon a private foundation, being, as we have said, a private corporation, it becomes important to inquire what is that foundation; and I have said *private foundation* to distinguish it from one of a public foundation.

Koblitz v. University.

Who is the founder? If there are no gifts or endowments given to the body, then there is but one founder and that is the one that bestows the charter.

Where there is an endowment then there becomes a private foundation if that endowment is given by individuals or persons separate from the state. In such case the government is the general founder, and, in the sense of private foundation, the founder is the one who has bestowed the endowment,

Now, to all eleemosynary corporations a visitatorial power attaches as a necessary incident. These corporations are composed of individuals and they are subject to infirmities and are liable to not carry out the purposes of the original giver of the funds. The law, therefore, from very early times has provided that there shall somewhere exist a power to visit and inquire into and correct all the irregularities and abuses, and to see that the charity is being applied according to the intention of the donor. If the state is the only donor, then the power to appoint visitors and the visitatorial power vests in the state. But, if the charity is one resting solely upon a private foundation, then the visitatorial power rests originally in the donor, and, at his death, in his heirs, and he may impart that power to any person or persons that he may see fit, and no formality nor precise language is required in imparting such power.

This doctrine is found in the courts from the earliest history of institutions of learning down to the present time. In Phillips v. Bury, 1 Raym., 58, Lord Holt says, that corporations are divided into two kinds, one for public government and the other for private charity. That those for public government are not subject to any founder or visitor, or particular statutes, or to the general and common laws of the realm and, by them, they have their maintenance and support; but the last sort of corporations for private charity, is entirely private and wholly subject to the rules, laws, statutes and ordinances which the founder ordains and to the visitor whom he appoints, and to no others; and if the founder has not appointed any visitor, then the law appoints the founder and his heirs to be visitors, for visitation was not introduced by the common law, but of necessity was created by the common law, and it is the office of the visitor, by the common law, to change according to the statutes of the college; and, by the statutes of the college is meant the conditions and terms upon which the endowment is given, to expel and deprive upon just occasion and to hear appeals; and from him and him only the party aggrieved ought to have redress, and in him the founder hath reposed so entire confidence that he will administer justice impartially, that his determinations are final and examinable in no other court whatever.

This was the rule of the common law, engrafted upon it from necessity, and the common law is applicable to the affairs of this state so far as it is adapted to our institutions; and it has been said that while the doctrine, that the founder is the visitor and after him his heirs, cannot well be applied to institutions of learning in this country, for the reason that the heirs soon become so numerous that it would lead to confusion, whereas in England the oldest brother or the oldest son is always the heir and confusion is not so certain to follow as it would be in this country. Yet, because of this confusion, which is likely to follow both in England and especially in this country, it has become the custom of those who endow charitable institutions to bestow the visitatorial power

upon a board of trustees and that method of carrying out this purpose of the law had become a part of the common law of England before occasion arose to apply it to institutions in this state, and we have adopted in the form of the visitatorial power vesting and remaining in the trustees appointed to carry out the purposes of those who have bestowed the endowment. And, so far as this mode of applying the rule is concerned, it is entirely adapted to the institutions of this state and has been found to be the safest and most practical method of executing such charities.

In determining when a court of chancery will interfere with and regulate the affairs of a college, it becomes necessary to determine what is within the jurisdiction of the visitors or trustees, and what is not within their jurisdiction.

It has been repeatedly held that the duties of the visitor are strictly domestic, and that he has no power to act in a proceeding by a third person against the corporation for the specific performance of an agreement, and that if he did act, his action would be nugatory; and, as the authority of the visitor is domestic, his power is confined to offenses against the private laws of a corporation and he has no cognizance of acts of disobedience to the general laws of the land; and it has been repeatedly held that he is not bound to proceed according to the rules of the common law, nor according to any exact forms of proceeding, but the hearing must be fair and conducted in an impartial manner, and allow convenient time for the offender against such rules to make his defense.

Where there is a charter, giving powers, the charity must be regulated in the manner which the charter has pointed out; and where there is a local visitor, the court of chancery has no jurisdiction over any subject within the cognizance of the visitor. Attorney-General v. Price, 3 Atk., 108; 2 Ves., 328; Attorney-General v. Harrow School, 2 Ves., 551; 2 Kyd's Corp., 182, 187.

And it has been held in New York that a court of chancery can exercise no authority over an eleemosynary corporation in visitatorial character. Auburn Academy v. Strong, 1 Hopk. Ch., 278; 2 John's Chan., 379.

But the persons entitled to execute the visitatorial functions have frequently the management of the revenues with which the charity is endowed and, in such cases, courts of chancery, by virtue of their general jurisdiction, will compel them to account and for their administration in the same manner as other trustees. And in New York it was held that it might take cognizance of a cause in which the academy on one side and the teacher on the other were parties, upon some ground of its proper jurisdiction, as its power to cause contracts to be delivered up and cancelled. Auburn Academy v. Strong, *supra*.

There may be authorities cited to the point that even though the courts have no visitatorial power and cannot undertake to regulate the domestic affairs of the college, such as passing upon the reasonableness of the course of study, the reasonableness of the mode of discipline or what the discipline shall be, yet if the authorities governing the school have been indiscreet in their punishment and have inflicted unnecessary and uncalled-for punishment, and such indiscretion is carried to that extent that it does not show a spirit of fairness, nor an intention to do justice by the pupils, they will interfere so far as to require the authorities governing the college to do justice and give the party offending such con-

sideration as is necessary to arrive at the proper conclusion as to his guilt or innocence and as to the nature of his offense. And where the trustees control the funds donated for the support of the charity and they have abused their rights and privileges in the management of such funds, the courts will interfere to see that the purposes of the donors are carried out.

Beyond these two points the governmental authorities of this country have never, through the legislature nor through the courts, undertaken to interfere with the affairs of a private college, supported entirely by private funds and tuition, and not, in any way, deriving benefits from the state by way of support. But this class of corporations must all the while be kept separate and distinct from similar corporations which are formed for civil purposes, and from that class of like corporations which derive their support partly or wholly from the state or public revenues.

It is claimed in this case, that in refusing the plaintiff admission to the college for the second year, the authorities governing the college acted in such a way as to unnecessarily punish the plaintiff, and in a way that they were not warranted in doing under the facts in the case; and that they have made their punishment unnecessarily oppressive; and that the court should relieve from such unnecessary oppression and require the university to allow the plaintiff to continue his study of the law in the law school which he was attending. And there is some intimation that these charities, being intended for the use of any one who might avail himself of their benefit by way of becoming a student in the university, that to expel the student without just cause is to thwart the purposes of the endowment, and hence is a breach of the trust imposed in the university authorities.

It is also claimed that the rights of the plaintiff rest in contract and that he cannot be deprived of his right under his contract without due process of law, and that due process of law in this case means such a trial as is usually conducted by courts of justice, and that the plaintiff had no such trial, no such opportunity for trial, before the officers of the university, and that, therefore, he should be restored to his rights under the contract until such opportunity is given him by those in authority over the college.

His attorneys claim that he is entitled to have a complaint filed against him and submitted to him ; that he has a right to be present to hear all the testimony offered against him, and to offer such testimony as he may wish to offer in his own favor ; that he has a right to cross-examine witnesses called by the university ; that he has a right to be present by attorney during the trial, and to have his case conducted and argued by his attorney, and, in fact, insist upon all the formalities attending trials in courts of justice. These several claims we now proceed to consider.

We have no doubt of the proposition that oppression of a student may be carried to that extent that the courts would interfere in his behalf. Whether such oppression was exercised in this case, remains to be considered later. And we have no doubt that if a student is expelled without any cause whatever, or even is refused admission without any cause, and the charity is a public one, open to all persons who may see fit to avail themselves of its benefit, the courts would interfere in behalf of such persons denied the rights that are guaranteed to all persons.

But what facts would warrant the authorities of the university in refusing a student admission or excluding him from the privileges of the

school after admitted, remain to be considered. As to whether his rights rest in contract or not, is not very material in this case; for, if they rest in contract, then the consideration that he has paid for the privileges that he is to obtain under that contract, is paid under certain restrictions and conditions to be complied with upon his part, and upon such conditions and restrictions as may be imposed upon that contract by the authorities of the university, so long as they do not conflict with the laws of the state nor the laws of the country.

What then are the terms of such a contract? He, upon making that contract, agrees to submit himself to the reasonable discipline of the school. He agrees that his conduct and character shall be such as to in no manner be a detriment to the school; and this conduct and character he must bear in all his relations with the school and with the other students. He agrees that he will conform to the customs of the school; if it is the custom of the school that the professors shall discipline the scholars, reprimand, and inflict such punishment as is proper under the circumstances, then he has agreed that he will conform to that custom. And he agrees that when he fails in any of the duties devolving upon him, the authorities over the school may discipline him in such manner as shall be proper under the circumstances.

The university agrees with him that it will impart to him instruction; that it will aid him in the ordinary ways of his studies; that it will treat him fairly; that it will give to him every opportunity to improve himself, and that it will not impose upon him penalties which he in no wise merits, and that it will deal with him impartially.

These terms all enter into the contract.

It is said that, under the policy of this state, the professors have no authority to discipline by way of suspension or expulsion except as it may be done under rules laid down by the trustees of the university.

It has been the custom of all school authorities, for so long a time that it has become a rule of law, to commit the discipline of the school very largely, if not wholly, to the teachers; and this custom having become law, being recognized as the usual mode of proceeding, both by the school authorities and by the state, we have no hesitation in saying that if the plaintiff had a contract such as he says he has, that. then he submitted himself in that contract to be disciplined by the professors of the school. In fact, it has been found impracticable in colleges, and not for the best good of the pupils themselves, to lay down a large number of rules and attach to the violation of each one a penalty. It makes of the youth attending such schools, law-abiding persons largely from necessity and fear of punishment, rather than throwing them upon their own manhood and relying upon them to observe the golden rule without a code of laws to enforce it. And this, no doubt, is wisdom on the part of these institutions, and hence it has become the custom and the rule that young men in such institutions must do right according to their knowledge of right and wrong, and as they may be instructed in such matters by the teachers from time to time.

And the necessity of such cases would seem to forbid that every time that a pupil is to be disciplined the trustees should be called together and go through all the formalities of a trial in court to determine whether the party is guilty and what penalty shall be inflicted upon him for his wrong-doing. The trustees of such institutions live in remote parts of the country; they are generally men of business affairs, who cannot be summoned at any moment to the seat of learning, and who

have not the experience in teaching that the professors have, who do not know what is required to keep proper discipline in such institutions as well as the professors do, and are not as well adapted to carry out the purposes and designs of the institution in regard to governmental affairs as are the professors themselves. Such regulations would lead to long delays, would leave a rebellious student in the institution to corrupt others, without any speedy remedy, and are altogether impracticable in a large number of cases. The trustees of such institutions are not accustomed to meet more than once or twice a year at the seat of learning; then, being men of pressing business of their own, they are not capable of remaining there to go through a long and tedious trial, an examination of witnesses and a full hearing.

So, by common consent and common usage, such matters have been left largely, if not entirely, to the faculty, and their action in such matters is binding upon the institution they represent; and this is not unusual at all.

The same rule applies largely to all other kinds of corporations. The duties and powers of the minor officers and agents of corporations are not generally prescribed by the by-laws, but are determined by custom, so says Beach on Private Corporations, and whether or not the particular act be within the scope of an official's authority is to be determined largely by the circumstances of each case. And in commercial corporations where it is the custom for agents and minor officers to perform certain duties, although no such authority has been delegated to them, yet the custom has been such, if long enough continued, that the courts will hold all persons bound by the authority of the agents.

Here is a custom that has existed, as we have said, from the earliest times, and one that has become thoroughly fixed as a rule of law in all such institutions in our country.

This will not deprive the trustees from acting in such matters, nor will it permit the officers or the dean of the school to do anything contrary to law, nor will it allow him to do anything not within the power of the trustees of the corporation.

The same may be said as to trial. Custom, again, has established a rule. That rule is so uniform that it has become a rule of law; and, if the plaintiff had a contract with the university, he agreed to abide by that rule of law, and that rule of law is this: That in determining whether a student has been guilty of improper conduct that will tend to demoralize the school, it is not necessary that the professors should go through the formality of a trial. They should give the student whose conduct is being investigated, every fair opportunity of showing his innocence. They should be careful in receiving evidence against him; they should weigh it; determine whether it comes from a source freighted with prejudice; determine the likelihood, by all surrounding circumstances, as to who is right, and then act upon it as jurors, with calmness, consideration and fair minds. When they have done this and reached a conclusion, they have done all that the law requires of them to do. They are not trying the accused for crime as a civil court. They are helpless to pronounce the judgment of the civil authorities upon him. They are trying only the question whether it is detrimental to the good discipline and the good morals of the school to allow the person whose conduct is being examined, to remain in the school; and, if they find he is guilty, they determine the degree and pronounce a judgment that is fair under the circumstances. That may be a private reprimand. It may be a reprimand before the school. It

may be suspension; it may be expulsion; it may be any penalty that the authorities over the school may see fit to impose.

The only requirement necessary, so far as concerns a review of the matter in a court of justice, is that it shall not be so unreasonable and oppressive as to leave the conclusion of unfairness on the part of the teachers. It matters not whether we call this arrangement between the pupils and the authorities over the school a contract or a license. The same results and the same relations and the same duties and the same obligations arise if we call it a license, as arise if we call it a contract.

But it is insisted by the plaintiff that, by reason of his contract, he got a right or a property. that cannot be taken away from him without a full and complete trial before the proper authorities. That right or property is worked out by him in this way: That this institution was endowed; that so far as the endowment went, he was charged nothing for its benefits, but wherein the endowment failed to pay the expenses, he was to pay a consideration, and that he paid $100, and was willing and ready to pay the $100 for the second year, but the university refused to receive it, and what he got in return was not only benefits to the extent of his $100, but benefits growing out of the endowment or all moneys that had been contributed to the building up or sustaining of the law school. I confess this is not very clear, and, in reading over the brief carefully of the attorney for plaintiff, it is a little difficult to make out just wherein he gets this consideration over and beyond what he has himself paid. But this proposition is made the basis on which this superstructure is built, of right to trial in a formal manner as though the proceeding was had in court.

We see nothing whatever in this proposition. If there was any agreement here at all, it was simply that if he would pay $100 the university would impart to him instructions for one year; at the end of that year they were ready to contract further, for further tuition and further instruction. The university refused to enter into any further contract. He had received the full consideration that he was to receive for the contract for the first year, and the university refused to enter into a further contract because he was not a fit subject to become a student in its law school.

But this interest is worked out through an old custom or rule that existed in very early times in England wherein the masters, the fellows and the students became in some way interested in the endowment. But this doctrine has long since been obsolete in England and never existed at all in this country, nor is there any ground for giving it the place that is now claimed for it in this case, and the mere statement of the proposition contended for is a refutation of it.

We come, then, to the conclusion that a court of chancery may be justified in this country in hearing a complaint of this character where there has been unnecessary oppression and unfair dealing, and also in a case where there has been an expulsion that violates the purposes of the trust.

It is the purpose of every trust of this character, that only such students shall attend the school as can bring with them a good moral character and that degree of intelligence and preparation required of the students; and, in order to remain members of the school according to the intention of the trust, it is necessary that they should retain that character, refrain from conduct that would be demoralizing upon the school, and make such progress in the studies as will enable them to

Koblitz v. University.

pass the required examinations; and, if in inflicting punishment upon the plaintiff, the school has not gone beyond what was reasonable by reason of the plaintiff's conduct and scholarship, then this court is at the end of its inquiry and the plaintiff would have no standing in court.

This leads us to inquire into the evidence in this case as it is presented to the court, and, in doing this, it is not our province to enter upon it with a view to ascertaining whether the college authorities were fair and right to the very letter of the law, but whether they acted with that prudence and discretion and fairness that men circumstanced as they were generally exercise in such affairs.

The testimony before us tends to show, and, we think, does fairly show, that the plaintiff's scholarship in the school has been poor and that, while a student during the year that he attended the law school, he was twice arrested on criminal charges; that he carried a revolver and threatened to inflict violence upon a fellow student; he indulged in abusive language and disorderly conduct towards fellow-students in and out of the school building; he was untruthful. When he was notified by the faculty to appear before them by reason of some of these offenses, for an examination, he said that he did not know whether he would go or not, that if they undertook to discipline him, they would find they had a lawsuit on their hands, and the evidence shows that he was a disturbing element in the school and a very undesirable student.

He denies many of these accusations, but not all of them. He bought a book from a fellow-student and ascertained afterwards from one of the professors that it was not the latest edition and was not the edition they were using in the school, but that it would serve his purpose very well. Thereupon he clandestinely entered the building and the room of the student who sold him the book, and took from the room a book, not of the student who sold him the book, but from that student's room-mate, which book he proposed to hold until the money was refunded to him for the book that he bought. He convicted his fellow-student without trial, and he inflicted a most unreasonable punishment and when the faculty persuaded him to relent and desired him to mend his ways and reform his conduct, he informed them that if they undertook to discipline him, they would find themselves with a lawsuit on their hands.

It seems to us that such conduct from a young man who has a fair mind and an honest purpose, is impossible. And we believe that the authorities were entirely right in refusing him admittance upon the second year.

Injunction is denied, and plaintiff's petition is dismissed at his costs.